UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| TRACI J. KREPS, AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF MARK L. KREPS; AND MARK L. KREPS, <br><br>             Plaintiffs, <br><br>   vs. <br><br>DEPENDABLE SANITATION, INC., CRAIG O. WEST, <br><br>             Defendants/Counter Claimants. <br><br>CRAIG O. WEST, <br><br>             Third-party Plaintiff, <br><br>   vs. <br><br>RDO EQUIPMENT CO., <br><br>             Third-party Defendant. | 4:21-CV-04108-KES <br><br><br><br>ORDER ON MOTION TO PERMIT DESTRUCTIVE TESTING <br><br>Docket No. 50 |
| ROCHELLE A. CONNELLY, AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF STEVEN L. CONNELLY; AND ESTATE OF STEVEN L. CONNELLY, <br><br>             Plaintiffs, <br><br>   vs. <br><br>DEPENDABLE SANITATION, INC., CRAIG O. WEST, <br><br>             Defendants. | 4:21-CV-04118-KES <br><br><br><br>ORDER ON MOTION TO PERMIT DESTRUCTIVE TESTING <br><br>Docket No. 32 |

## INTRODUCTION

These matters are before the court arising out of an automobile accident in Brown County, South Dakota, involving the parties. See Docket Nos. 1. Jurisdiction is premised on the diverse citizenship of the parties and an amount in controversy exceeding $75,000. Id. Now pending are identical motions by defendants, Dependable Sanitation, Inc. and Craig O. West, to conduct destructive testing of samples of blood taken from Mr. West and plaintiff Mark Kreps following the accident. See Docket Nos. 32 & 50. Plaintiffs oppose the motions. See Docket Nos. 35 & 36[1]; and 53 & 54. These motions were referred to this magistrate judge for determination pursuant to 28 U.S.C. § 636(b)(1)(A) and Local Rule 57.11.

## FACTS

On August 18, 2020, shortly after 2 o'clock in the afternoon defendant Craig West was driving a garbage truck owned by his employer, defendant Dependable Sanitation. Mr. West was traveling west in the left lane on United States Highway 12, a divided highway at this point. Plaintiffs Mark Kreps and Steven Connelly were following Mr. West's garbage truck with Mr. Kreps driving. Mr. West slowed to make a left-hand turn into a gravel median crossover separating the eastbound and westbound lanes of Highway 12. An eyewitness to the accident testified that Mr. West had his left turn blinker

---

[1] All docket numbers in the 30s are cited from the Connelly case; all docket numbers in the 50s are cited from the Kreps case. The court will distinguish when necessary if other docket numbers are cited.

activated prior to the collision. See Docket No. 36-4 at pp. 2-3 (Usselman depo at pp. 26 & 36).

Plaintiffs'[2] vehicle rear-ended the garbage truck, resulting in the deaths of both Mr. Kreps and Mr. Connelly. Both plaintiffs were residents of North Dakota while both defendants are residents of South Dakota.

Following the accident, blood samples were taken from Mr. West and Mr. Kreps and sent to the South Dakota State Health Lab for testing. The state lab revealed small amounts of methamphetamine, amphetamine, and carboxy THC (marijuana) in Mr. West's blood sample and nothing in Mr. Kreps' blood sample. See Docket No. 36-1. Mr. West admits to having occasionally used marijuana, though he asserts it was many days before the accident that he last used. See Docket No. 36-2 at pp. 5-6 (West Depo. at p. 100-01). He adamantly denies having used methamphetamine or amphetamine. See Docket No. 36-2 at pp. 3-4 (West depo. at pp. 98-99). When asked whether he was taking "any medications or prescriptions at the time of the collision," he responded only that he had taken Prilosec for heartburn or acid reflux. See Docket No. 36-2 at p. 2 (West depo. at p. 52).

Defendants assert that the state lab cannot differentiate between illegal methamphetamine (the "D" isomer) and methamphetamine that occurs in legal prescription drugs or over-the-counter medications (the "L" isomer). For example, defendants assert the L isomer is found in nonprescription

---

[2] For convenience only, the court uses the term "plaintiffs" to refer to Mark Kreps and Steven Connelly because these were the plaintiffs involved in the accident. The court recognizes that Rochelle Connolly and Traci Kreps are also plaintiffs in this matter in their own right.

medications used to treat Gerd, such as Prilosec, which Mr. West testified he had taken on the day of the accident. Defendants assert that Prilosec is known to cause false positive results for methamphetamine in blood tests. See Docket No. 55 at p. 6. Furthermore, defendants assert plaintiffs' theory of liability is that he was driving intoxicated by methamphetamine, but the L isomer of methamphetamine has no intoxicating effect according to defendants. Therefore, defendants seek to have Mr. West's blood sample tested by a laboratory that can differentiate between the legal "L" and illegal "D" forms of methamphetamine.

In support of their motion, defendants submitted an email from an employee at the state lab stating that the lab does not perform a test to separate the "D" and "L" forms of methamphetamine. See Docket Nos. 34-1 & 52-1. The employee informed defense counsel that if she wished to have the blood sample sent to another lab for such a test, the state lab could send the sample to the other lab. Id. In response to questions asked by defense counsel, the state lab employee wrote that the lab does not have data or a report indicating rates of false negatives or false positives and that the lab maintains no written quality control programs and procedures. Id. The employee indicated there would be a +/- 20 percent margin of error with any drug testing, including in Mr. West's case. Id.

Defendants also seek to retest Mr. Kreps' blood sample for the substances Citalopram, Hydroxyzine, and Zaleplon, which are medications defendants assert are "known to affect a person's ability to operate a vehicle,

and which Kreps admittedly was prescribed." See Docket No. 55 at p. 2. The state lab previously informed defendants' counsel that it does not test for these three prescription medications. See Docket No. 52-2 at p. 1.

The Krepses have designated an expert who, based in part upon the state lab blood tests, has opined that the blood concentration of methamphetamine in Mr. West's blood at the time of the accident may have negatively impacted Mr. West's driving behavior. See Docket No. 36-6 at pp. 4-5. This expert acknowledged that methamphetamine is indicated and approved for treatment of Attention Disorder with Hyperactivity and for the treatment of Exogenous Obesity. Id. at p. 4. The Kreps' expert opined that the amount of THC in Mr. West's blood likely did not impair him. Id. at pp. 5-6.

Initially, when defendants filed their motions for destructive testing in both cases, they had the understanding that there was only 5 milliliters of blood left for Mr. West and a similar amount for Mr. Kreps. Since the testing defendants were requesting permission to undertake required 4 milliliters of blood, the motion is termed one for "destructive testing" because the 1 milliliter of blood left over would be insufficient to allow plaintiffs to do "rebuttal" testing. However, after filing their motion but before their reply brief was due, defendants learned that there were in fact two vials of blood taken from each of the drivers and that there *is* sufficient blood left for both parties to conduct their own testing of both Mr. West and Mr. Kreps' blood. See Docket No. 55-1.

5

**DISCUSSION**

**A.     Defendants Have Demonstrated Grounds for the Testing**

**1.     Defendants Have Shown Good Cause Under Rule 35**

The parties understandably initially focused their discussion on the law applicable to destructive testing.  However, defendants discovered mid-way through the briefing on this motion that there are sufficient blood samples remaining for both Mr. West and Mr. Kreps to allow both parties to conduct their own independent testing of the two men's blood samples.  Although the process of testing will result in destruction of that portion of the blood used for the test, it will not result in destruction of the entirety of the blood sample available.  Thus, the court construes defendants' motions to be for "testing" of the two blood samples rather than "destructive" testing.

Rule 35 of the Federal Rules of Civil Procedure provides that the court can order physical and mental examinations, including blood testing, if a party's mental or physical condition is in controversy.  See Fed. R. Civ. P. 35(a)(1).[3]  Wright and Miller state that blood tests are authorized under Rule 35.  8B Charles A. Wright, Arthur R. Miller, & Richard L. Marcus, Fed. Practice & Procedure, § 2235, p. 281 (2010).  Some commentators have noted that—at least as long ago as 1968--blood testing was so routine that Rule 35 need not

---

[3] In a products liability case, the Eighth Circuit analyzed a request for destructive testing under Rule 34.  Dabney v. Montgomery Ward & Co., 761 F.2d 494, 498 (8th Cir. 1985).  But Rule 34 requires that the thing to be tested be in the "possession, custody or control of the" opposing party.  See Fed. R. Civ. P. 34(a)(1).  Here, this court does not analyze defendants' motion under Rule 34 because the blood samples are not in any of the parties' possession, custody or control.

specifically mention it.  <u>Proposed 1967 Amendments to the Federal Discovery Rules</u>, 68 Col. L. Rev. 271, 299 n. 128 (1968).

Rule 35 request that a motion be made in which good cause for the testing is demonstrated, with notice to all other parties of the person to be examined and the time, place, manner, conditions, and scope of the examination as well as the person or persons who will perform the exam.  Fed. R. Civ. P. 35(a)(2).

Here, defendants have shown good cause.  The physical and mental conditions of both drivers are in issue:  defendants assert Mr. Kreps' driving may have been impaired because of the medications he was prescribed and for which the state lab does not test.  Defendants point out that Mr. Kreps rear-ended Mr. West's garbage truck in broad daylight under circumstances where Mr. West had his left turn signal on and there was room in the right lane of the highway for Mr. Kreps to have moved over to avoid the collision.  These facts, defendants argue, point to some other factor which impaired Mr. Kreps' driving the day of the accident.

Plaintiffs, particularly the Krepses, have placed Mr. West's physical and mental status into controversy, alleging that he had methamphetamine and amphetamine in his blood at the time of the accident and producing an expert's report opining that the methamphetamine likely had a negative effect on Mr. West's driving abilities.

On this point, defendants argue that "L" methamphetamine is not intoxicating, so would not have impacted Mr. West's driving ability.

7

Furthermore, Mr. West ingested Prilosec, a substance defendants assert has the ability to produce a false positive drug test result for methamphetamine. The state lab results do not indicate intoxication because they do not distinguish between "L" and "D" methamphetamine and they do not report on false positives. Therefore, defendants argue, testing by another laboratory is necessary to determine these issues. The court finds defendants have satisfied the requirements of Rule 35.

### 2. Destructive Testing

Alternatively, the court analyzes the defendants' motion under the destructive testing rubric discussed by the parties in their briefs. In one sense, the testing defendants propose *is* destructive even though sufficient blood will be left over to allow plaintiffs to do rebuttal testing. That is because the sample used by the defendants will be consumed by the testing. It will cease to exist, so in this sense it will be destroyed, even though more of the blood sample remains available after the testing. Several courts have applied destructive testing analysis to such tests which, while destructive, nevertheless leave a remainder of the item or substance intact. Mirchandani v. Home Depot, U.S.A., Inc., 235 F.R.D. 611, 612-13 (D. Md. 2006) (involving testing of only one of two safety bolts in a ladder); Ostrander by Ostrander v. Cone Mills, Inc., 119 F.R.D. 417, 418-20 (D. Minn. 1988) (involving testing of only a fragment of sleepwear, leaving some of the fabric intact and undisturbed).

Eighth Circuit case law is sparse on the subject of whether and under what circumstances to allow destructive testing. Generally, courts have

analyzed four factors: (1) whether the testing is reasonable, necessary and relevant to proving the defendants' case; (2) whether the plaintiffs' ability to present evidence at trial will be hindered or whether the plaintiffs will be prejudiced in some other way; (3) whether there is any less prejudicial alternative methods to obtain the sought after evidence; and (4) whether there are adequate safeguards to minimize prejudice to plaintiffs, particularly plaintiffs' ability to present evidence at trial. White v. Cooper Tools, Inc., No. Civ. 06-4272, 2010 WL 1418244 at * 2-3 (D.S.D. Apr. 6, 2010) (citing Conway v. Kaz, Inc., Civ. Action No. 09-CV-10065-DT, 2009 WL 3698561 at *2 (E.D. Mich. 2009)); Mirchandani, 235 F.R.D. at 614.

Here, the facts arising from the accident are *not* one-sided. On the one hand, plaintiffs argue that Mr. West's slowing down to make a left turn on a divided highway where there was no official point of egress was so sudden and unexpected as to be negligent. Defendants argue that Mr. Kreps' driving was negligent in that it was broad daylight with clear visibility, Mr. West signaled his intention to turn, and Mr. Kreps had the ability to evade the collision by moving his vehicle into the right-hand lane.

With such evenly-balanced arguments, the introduction of the allegation that Mr. West was intoxicated by illegal methamphetamine at the time of the accident introduces a material change in the balance of the evidence. If Mr. West can show he was not intoxicated and that the positive methamphetamine test resulted from the ingestion of something as prosaic as

over-the-counter heartburn medicine, this could be crucial to proving his driving was not negligent.

Likewise, the testing of Mr. Kreps' blood has the potential to alter the balance of the evidence at trial. If the defendants' testing shows the presence of some substance known to negatively affect a person's ability to drive, that may significantly change the way the jury views the evidence. The court concludes the proposed testing of both samples is reasonable, necessary and relevant.

Nor are plaintiffs prejudiced. Just because the test may result in evidence that undermines plaintiffs' theory of liability does not mean the plaintiffs are prejudiced. Rather, the court inquires as to *unfair* prejudice: will plaintiffs be prevented from performing tests of their own or from presenting evidence at trial? Here, the answer is "no." Plaintiffs still have the state lab test results to use at trial along with their expert opinion based on those test results. And plaintiffs can retest the remaining samples if they wish. Finally, the court notes that the defendants' test may affirm rather than undermine plaintiffs' theory of the case—the test may show Mr. West in fact had the illegal "D" isomer of meth in his system that *is* intoxicating. Plaintiffs can hardly claim they would be prejudiced by such a result.

The parties have not suggested any other reasonable less prejudicial alternative for defendants to obtain the evidence they seek. There is only one way to find out if the methamphetamine and amphetamine found by the state lab in Mr. West's blood was the "L" or the "D" variety and that is to test the

10

blood sample.  Similarly, there is only one way to find out if Mr. Kreps' blood had Citalopram, Hydroxyzine, or Zaleplon in it—by testing Mr. Kreps' blood sample.

The final factor for the court to consider is whether there are adequate safeguards that can be put in place to minimize prejudice to the plaintiffs, particularly plaintiffs' ability to present evidence at trial.  The court can require defendants to notify plaintiffs—consistent with the requirements of Rule 35—of the time, place, manner and identity of who will perform the testing.  In addition, the court can require that defendants disclose to plaintiffs the results of the testing once it is completed.  Plaintiffs may then decide whether to seek testing of the remaining samples with their own expert or whether they are content to rely on the state lab test results.

In Ostrander, plaintiffs brought a products liability suit against defendant alleging defendant's sleepwear was unreasonably dangerous because of its flammability.  Ostrander, 119 F.R.D. at 418.  Defendants sought permission to perform destructive testing of two 3.5-inch by 10-inch sections from the garments, which would still leave samples of the garments untouched for use at trial or for plaintiffs to test.  Id.  Defendants asserted the testing was necessary to determine whether the flammability stemmed from the material itself, or from chemicals accumulated in laundering the sleepwear.  Id.  The court granted defendant's motion, characterizing the issue of flammability to be "critical," and defendant's proposed testing pivotal to that issue.  Id.  The court

observed that the plaintiffs had done their own testing and could perform further tests after defendant produced its test results. Id.

Similarly, in Mirchandani, the court allowed plaintiffs to perform destructive testing of one of two safety bolts from a ladder where no other alternative other than testing would suffice, where defendants had an equal opportunity to examine and test the ladder and bolts, and where defendants had videotaped evidence that the ladder could be safely climbed with the existing bolts. Mirchandani, 235 F.R.D. at 614-17.

The court finds defendants have shown they are entitled to testing under the four-factor balancing test set forth above. The court now turns to specific objections raised by plaintiffs.

**B.     Objections to Testing by Plaintiffs**

    **1.     Reliability**

The Connellys object to the testing on the grounds that both parties have the state lab results and can use them at trial. They argue that defendants can establish through cross-examination the fact that the state lab did not test to distinguish between "L" and "D" methamphetamine and can introduce their own evidence concerning possible causes of a false positive or the non-intoxicating nature of "L" methamphetamine. In other words, Connellys argue that defendants can always argue at trial that the state lab results are unreliable. A similar argument was rejected in the Ostrander case. Ostrander, 119 F.R.D. at 420 (rejecting plaintiff's opposition to defendant's proposed

destructive testing on the grounds that a test had already been performed and the results of the test disclosed to the defendant).

The Krepses, having been made aware of the fact before they filed their brief that there were adequate samples remaining to allow testing by both parties, attack the reliability of testing blood samples that are two years old. They argue that defendants must first demonstrate that testing of the samples at this late date will still yield reliable results before being allowed to embark on the requested tests.

Both the Krepses and the Connellys are wrong.  The Federal Rules of Evidence will apply in this matter to determine whether the test results are admitted into evidence.  The Federal Rules of Civil Procedure distinguish between *discoverability* and *admissibility* of evidence, leaving the latter discernment to the province of the Rules of Evidence.  See Fed. R. Civ. P. 26(b)(1), 32, and 33(a)(2).  Therefore, the Rules of Evidence assume the task of keeping out incompetent, unreliable, or prejudicial evidence at trial.  These considerations are not inherent barriers to discovery, however.

Federal Rule of Evidence 702 will govern the admissibility of expert testimony at the trial in this matter.  See FRE 702.  That rule provides that if an expert's scientific, technical or other specialized knowledge will help the jury, the testimony may be admitted if it is based on sufficient facts or data, is the product of reliable principles and methods, and the expert reliably the applied the principles and methods to the facts of the case.  Id.

In this regard, the court notes that the state lab does not test to distinguish between "L" or "D" methamphetamine.  <u>See</u> Exhibit 52-1.  In addition, according to the email sent to defendants' counsel, the state lab has no written quality control procedures.  <u>Id.</u>  The state lab does not keep track of (or does not report on) false positives and false negatives.  <u>Id.</u>  And the state lab states that there is a 20 percent +/- margin of error in their drug testing.  <u>Id.</u>

There is some question whether the state lab blood test results will be admissible at trial in this matter under Rule 702.  A 20-percent margin of error is considerable and if there is no tracking of false results, there is no verifiable rate of error, a significant factor in deciding whether to admit expert testimony.  <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 594 (1993) (stating that in considering whether to admit expert testimony, "the court ordinarily should consider the known or potential rate of error).

In the <u>Ostrander</u> case, the plaintiffs similarly opposed defendant's proposed destructive testing on the grounds that defendant's test results would not be scientifically valid and reliable.  <u>Ostrander</u>, 119 F.R.D. at 419-20.  The court rejected that argument, noting that admissibility of the results of defendant's testing was an issue of evidence for consideration at trial, not grounds for objecting to relevant discovery.  <u>Id.</u>  The court in <u>Mirchandani</u> also rejected an objection to testing based on the assertion that the testing was too speculative.  <u>Mirchandani</u>, 235 F.R.D. at 615.

This court offers up no predictions as to whether the state lab results will be admissible at trial.  But to the extent plaintiffs argue that defendants'

14

testing, which has not even been done yet, is unreliable, the court notes that that is an issue for another day. For today, it is enough to note that defendants have shown good cause for the testing.

### 2. Timeliness and Delay

Plaintiffs argue that if defendants are allowed to conduct the testing they request, it will touch off a new round of expert reports and delay this matter further. They argue that plaintiffs have already been delayed for two years.

The court notes that defendant first approached plaintiffs seeking permission for the requested testing well within the time frame allowed by the district court's scheduling order. Even now, defendants' motion is timely. The discovery deadline is not until October 31, 2022. See Docket Nos. 40 & 58. Defendants' deadline for designating a toxicology expert is October 24, 2022. Id. Plaintiffs have until December 22, 2022, to designate rebuttal experts. Id. And the expert discovery deadline is January 6, 2023. Id.

Furthermore, these lawsuits have not been pending for two years. Rather, they were filed with the court one year ago in June and July of 2021. The one year that elapsed between the accident and the filing of complaints in this court cannot be attributed to either the court or to defendants.

Nor is the fact that these cases have been pending in court for one year unusual or significant for litigation of this importance. All parties in the Kreps case initially agreed that May 2, 2022, was an appropriate deadline for discovery in this case. Docket No. 12 (parties' stipulated discovery deadline). The parties in the Connelly case initially stipulated to a September 2, 2022,

15

discovery deadline. See Docket No. 12. The current deadline of October 31, 2022, was arrived at by *joint agreement* of all the parties and is only a few months longer than the deadlines all the parties agreed upon initially. See Docket Nos. 39 & 57. The court concludes that defendants' motion is timely and will not frustrate the "just, speedy and inexpensive determination of" this case. Fed. R. Civ. P. 1.

Where a party requested destructive testing prior to the trial date, it was considered timely and was allowed. Cameron v. District Court in and for First Jud. Dist., 595 P.2d 925, 931-32 (Colo. 1977) (*en banc*). The Dabney case, cited by plaintiffs, is distinguishable because there, the defendant requested destructive testing four years after the accident and after the first trial had been had. Dabney v. Montgomery Ward & Co., 761 F.2d 494, 498 (8th Cir. 1985).[4] Here, as indicated, defendants' motion is timely under the district court's scheduling order, it is made only one year after the lawsuits were filed by plaintiffs, and no trial date has been set.

The court notes that defendants originally offered plaintiffs the opportunity to designate a laboratory of their own choosing so long as the lab had the capability to do testing to distinguish between the "L" and "D" isomers of methamphetamine and to test for the presence of Mr. Kreps' three prescription drugs. If plaintiffs are truly concerned about delay, the court

---

[4] In addition, in Dabney, the district court had granted the defendant's request to conduct other destructive testing, so the denial of the four-year-old request may have been based partly on the fact defendant had already been afforded the opportunity to conduct testing. Id. at 498-99.

offers them the same opportunity: stipulate along with defendants to a lab which is mutually-acceptable to all parties. That would eliminate the extra delay occasioned by plaintiffs having to perform rebuttal testing and find their own rebuttal toxicologists.

A trial is a search for "the truth in its entire fullness." Petruk v. South Ferry Realty Co., 2 A.2d 533, 536 (N.Y. 1956). Both parties should have a chance to introduce relevant evidence in that search. The court notes that the state lab was not chosen by either party to be their expert in this matter—the test results came from that lab as a matter of default, due to law enforcement's investigation of the accident. Plaintiffs, no less than defendants, will have the opportunity to find a laboratory of their own choosing that will produce results that are pertinent to the issues in this case. A determination as to admissibility of those results will be made by the district court as an adjunct to trial.

Finally, the court notes that no party to this action would seek to introduce the actual vials containing Mr. West and Mr. Kreps' blood at trial. Those vials would be meaningless to the jury. This fact distinguishes this case from cases involving destructive testing of a physical item which the parties contemplate admitting as an exhibit at trial, such as an allegedly defective tire (Cameron, 595 P.2d at 931-32), allegedly flammable pajamas (Ostrander, 119 F.R.D. at 418-20), or a metal link in a chain that failed (White, 2010 WL 1418244 at *1-3). The destruction of the blood in the testing in this case will not cause the disappearance or material alteration in appearance of a physical

trial exhibit. This fact further supports allowing defendants to conduct the proposed testing.

## CONCLUSION

Based on the foregoing facts, law and analysis, it is hereby

ORDERED that defendants' motions for permission to conduct destructive testing of samples of Mr. West's and Mr. Kreps' blood (Docket Nos. 32 and 50) is hereby granted. The parties may confer and stipulate upon a lab to conduct the testing that is mutually agreeable to all parties. It is further

ORDERED that if the parties cannot reach agreement within 14 days as to a mutually-agreeable lab for the testing, defendants are free to conduct the testing at a lab of their sole choice. In such case, plaintiffs are hereby also granted permission to conduct destructive testing at a lab of their own choosing of the remaining samples. In the event defendants or plaintiffs conduct testing at a lab of their sole choosing, prior to such testing the party shall notify the other parties in this case of the time, place, manner, conditions, and scope of the testing along with the identity of the lab or persons who will conduct the test. Furthermore, after such testing, the party who conducted the test shall immediately disclose to all other parties the results of the testing.

DATED this 7th day of September, 2022.

BY THE COURT:

*Veronica L. Duffy*

VERONICA L. DUFFY
United States Magistrate Judge